IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATHAN FRAME, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:22-cv-326 |
| v. | ) |
| | ) |
| ERIE METROPOLITAN TRANSIT | ) |
| AUTHORITY D/B/A/ EMTA, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

Pending before the Court is Plaintiff's Motion for Spoliation Sanctions Pursuant to Fed. R. Civ. P. 37(e). ECF No. [45]. For the reasons set forth below, the motion will be denied without prejudice insofar as Plaintiff seeks relief under Rule 37(e)(1). The motion will be denied with prejudice to the extent Plaintiff seeks relief under Rule 37(e)(2).

I.     BACKGROUND

In the instant civil action, Plaintiff Nathan Frame alleges that the Erie Metropolitan Transit Authority d/b/a EMTA ("EMTA") violated the Americans with Disabilities Act ("ADA" - 42 U.S.C. § 12101 et seq.), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. § 2601 et seq.), the Rehabilitation Act ("RA"- 29 U.S.C. § 794 et seq.), and the Pennsylvania Human Relations Act ("PHRA"), when it terminated his employment on June 20, 2022. Plaintiff is an individual who suffers from anxiety, panic disorders, and depression. Prior to his termination, he was employed by EMTA as a paratransit driver whose responsibilities included providing door to door services for disabled individuals.

On Saturday, June 18, 2022, Plaintiff had a telephonic discussion with Dispatcher James

1

Hudson concerning his pick-up assignments. The circumstances of this discussion are disputed by the parties.

Plaintiff contends that, on the day in question, he was assigned conflicting pick-up duties on opposite sides of town which he could not practically perform. Plaintiff testified that, consistent with common practice, he brought the scheduling conflict to Hudson's attention. He contends that he did not said anything inappropriate when speaking with Hudson. Frame Depo. ECF 45-12, at 87:19-88:20. He recalled telling Hudson he was on break and that the individual he was asked to pick up was on another employees' route. *Id.* at 88:24-89:2. He informed Hudson that he could not pick up the individual because he was already scheduled for three different pickups across Erie, which would make him late for one of those pickups. *Id.* at 89:2-5. Plaintiff also told Hudson:

> You're new here, but I have anxiety and I start to panic. And if that happens, I would just rather get those moved back to their buses that they would need to be so I can, you know, continue with my work. Because I would – I would hate that, go through a panic mode. I would hate to have to come back and make sure, you know, I – I would leave my co-workers with extra work and that's not fair.

*Id.* at 89:6-13.

EMTA contends that Plaintiff's behavior toward Hudson was unprofessional and warranted termination. On Monday, June 20, 2022, EMTA Director Ed Torres, Operations Supervisor Julie Myers, Human Resources Director Theresa Lugo,[1] and Supervisor Matt Sanfilippo met with Frame to address the situation. Prior to this meeting, Myers, Torres, and Lugo had discussed the incident and expected to terminate Frame's employment but "wanted to hear what he had to say first." Myers Depo, ECF No. 45-5 at 89:2-3; *see also id.* at 88:20-90:1; Torres Depo., ECF No. 45-6 at 52:14-53:4; Lugo Depo., ECF No. 45-7 at 55:14-56:14.

---

[1] At times during this litigation, and prior to her marriage, Theresa Lugo was known as Theresa Croll. For the sake of consistency, the Court will refer to Mrs. Lugo by her marital name.

2

After hearing from Plaintiff, Torres fired him and had him escorted from the building. Plaintiff was issued a letter that same day stating that Torres had terminated him "due to [his] unprofessional conduct and insubordination on Saturday June 18, 2022." ECF No. 45-9. The letter went on to state, in relevant part:

> Your interaction with Dispatch James Hudson was recorded. You failed to accept responsibility for your actions, stating that you were not unprofessional. Mr. Torres advised you that the situation was not up for discussion. As such your position with EMTA has been terminated effective June 20, 2022.

*Id.*

On July 15, 2022, Plaintiff filed a charge of discrimination with the EEOC. After exhausting his federal administrative remedies, Plaintiff filed this lawsuit on October 24, 2022.

In the course of discovery, Plaintiff's counsel sought to obtain a recording of the June 18, 2022 exchange between Plaintiff and Hudson. Plaintiff's attorney was advised that the recording had been lost when "EMTA hired a company to upgrade their system." ECF No. 45-11. The Court granted Plaintiff an extension of discovery for purposes of investigating the circumstances of the lost recording, and EMTA designated Lugo as its Rule 30(b)(6) witness on that matter. Lugo was deposed in that capacity on November 2, 2023. *See* Lugo Depo., ECF No. 51.

According to Lugo, EMTA first became aware of Plaintiff's legal claims against it around July 15, 2022, when Plaintiff filed his charge of discrimination with the EEOC. ECF No. 51 at 10:5-15. EMTA did not issue a general, companywide notice to preserve relevant documents or recordings at that time, *id.* at 10:16-21, 11:4-6, although Lugo personally took steps to locate and retrieve relevant human resources documents. *Id.* at 11:7-13:10. EMTA also did not issue a general preservation notice after it became aware of the instant lawsuit in November 2022. *Id.* at 14:21-15:6. Lugo acknowledged that EMTA has no written retention policy concerning personnel records. *Id.* at 17:20-18:4. However, she explained that, as a matter

of company practice, any time a supervisor issues a sanction against an employee, including a verbal or written warning, the action is documented, forwarded to the human resources department, scanned into the system, and preserved as part of the employee's official personnel file. *See id.* at 15:17-18:4. If a supervisor addresses an employment matter with an employee without issuing a formal sanction, that discussion does not independently get reported to human resources, but it could be incorporated into a formal disciplinary report at a later point in time and become part of the employee's personnel record in that way. *See id.* at 16:6-18:18.

Lugo testified that EMTA utilizes numerous servers for separate purposes, including audio recordings, video recordings, and electronic documentation. ECF No. 51 at 20:14-21. The audio recording system is specific to the paratransit department, where Plaintiff was employed, because EMTA is federally mandated to ensure certain customer service standards. *Id.* at 20:15-18, 21:9-12; 23:23-24:4. As of June 2022, the phones in EMTA's paratransit department were connected to a backup system, which allowed supervisors or dispatchers to enter a portal, using special login credentials, and obtain access to recorded conversations. *Id.* at 24:18-24; 28:20-29:19; 30:1-8; 31:3-19. As with its electronic documentation, EMTA had no formal retention policy relative to its audio and visual recording system, *id.* at 21:8-9; however, EMTA's general "rule of thumb" was to "retain everything on the server." *Id.* at 20:10-13; *see id.* at 21:8-14. To that end, EMTA paid a third-party vendor, known as "ECS," to provide telecommunication services and house its telephonic audio recordings on a server. *Id.* at 21:14-16; 25:7-13. After EMTA learned of Plaintiff's discrimination charge in July 2022, it did not issue an instruction to preserve the recording of Plaintiff's June 18, 2022 exchange with Hudson because (according to Lugo) "the server was preserving everything. That was our operational standard, we just preserved everything on the server . . . ." *Id.* at 32:1-7.

4

According to Lugo, ECS notified EMTA on the afternoon of August 23, 2022 that the server was "fritzing out. It was crashing and coming up, crashing and coming up and they were working on repairs." ECF No. 51 at 22:16-20; *see also id*. at 33:16-34:1. A day and a half later, on August 25, 2022, EMTA received notice that ECS was unable to "revive the server and it had just died." *Id*. at 22:21-24; *see also id*. at 34:1-9. As a result, EMTA lost all of its then-existing recordings, including the recording of Plaintiff's June 18, 2022 exchange with Hudson. *Id*. at 23:1-3; 32:14-33:12; 34:15-20. According to Lugo, certain "tech pieces that would need to support the old server" were "no longer made," so EMTA moved to a new audio recording system supported by an upgraded server. *Id.* at 25:18-26:2; 35:6-8.

On December 20, 2023, Plaintiff filed the instant motion for spoliation sanctions. ECF No. 45. The motion has been fully briefed and is ripe for resolution. ECF Nos. 46, 47, 48.

## II.   DISCUSSION

Plaintiff's motion requests spoliation sanctions under Rule 37(e) of the Federal Rule of Civil Procedure. He submits that, as an appropriate sanction, the Court should strike EMTA's affirmative defense advancing a legitimate non-discriminatory and non-retaliatory reason for his termination. Additionally, Plaintiff submits that the Court should draw a negative inference against EMTA in advance of any Rule 56 motion the Defendant may file.

Rule 37(e) addresses the failure to preserve electronically stored information (ESI) as follows:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the

      information's use in the litigation may:

        (A) presume that the lost information was unfavorable to the party;

        (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

        (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). To impose sanctions pursuant to this rule, a judge must find that (A) the spoliating party had a duty to preserve information when the loss occurred; (B) the lost ESI was within the scope of that duty to preserve; (C) the spoliating party's failure to take reasonable steps to preserve the information led to its loss; and (D) the information is truly lost, *i.e.*, it cannot be otherwise recovered. *Domus BWW Funding, LLC v. Arch Ins. Co.*, No. 2:23-CV-00094-JDW, 2024 WL 3761737, at *4 (E.D. Pa. Aug. 12, 2024) (citing Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).

    Here, the Court finds that EMTA had a duty to preserve relevant evidence as of approximately July 15, 2022, when it received notice of Plaintiff's EEOC discrimination charge. At that point, litigation involving the instant discrimination charges was reasonably foreseeable. *See Neal v. Powell*, No. CV 17-4768 (KMW/MJS), 2024 WL 3466800, at *5 ("[T]he duty to preserve evidence begins when litigation is 'pending or reasonably foreseeable.'") (quoting *Dunn v. Mercedes Benz of Fort Wash., Inc.*, Civ. No. 10-1662, 2012 WL 424984, at *5 (E.D. Pa. Feb. 10, 2012)).

    The Court also finds that the lost ESI was within the scope of EMTA's duty to preserve. The audio recording of Plaintiff's exchange with Hudson is plainly relevant to the claims and defenses in this case. Plaintiff's termination letter references the June 18, 2022 incident as a basis for his termination. Myers confirmed that the reason for Plaintiff's termination was "insubordination" and his "refus[al] to go pick up a customer." Myers Depo, ECF No. 45-5 at

6

87:13-19. Myers formed her opinion that Plaintiff had been "unprofessional" in "his language [and] attitude" after listening to a recording of the conversation between Plaintiff and Hudson. *Id.* at 91:7-92:8. Torres confirmed that he and Lugo also listened to the recording prior to the termination meeting with Frame. ECF No. 45-6 at 56:15-57:9. Torres' view of the situation was that Plaintiff "became kind of aggressive with . . . Mr. Hudson, and didn't want to follow his orders." *Id.* at 46:5-7. The audio recording is not only highly relevant to EMTA's proffered basis for Plaintiff's dismissal; it is the best evidence of what actually transpired between Plaintiff and Dispatcher Hudson on June 18 2022.

It also appears that the audio recording is truly lost and cannot be otherwise recovered. According to Lugo, EMTA employees met with ECS representatives following the server crash and were advised that ECS "did everything possible to restore [the server] because they knew we needed the audio and they were unable to do so. . . ." ECF No. 51 at 34:21-35:5.

The question becomes whether the audio recording was lost due to a failure on the part of EMTA to take "reasonable steps to preserve it." Fed. R. Civ. P. 37(e). The advisory committee notes to the rule make clear that

> The rule applies only if the information was lost because the party failed to take reasonable steps to preserve the information. Due to the ever-increasing volume of electronically stored information and the multitude of devices that generate such information, perfection in preserving all relevant electronically stored information is often impossible. As under the current rule, the routine, good-faith operation of an electronic information system would be a relevant factor for the court to consider in evaluating whether a party failed to take reasonable steps to preserve lost information, although the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation. This rule recognizes that "reasonable steps" to preserve suffice; it does not call for perfection. The court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation.
>
> Because the rule calls only for reasonable steps to preserve, it is inapplicable when

7

> the loss of information occurs despite the party's reasonable steps to preserve. For example, the information may not be in the party's control. Or information the party has preserved may be destroyed by events outside the party's control--the computer room may be flooded, a "cloud" service may fail, a malign software attack may disrupt a storage system, and so on. Courts may, however, need to assess the extent to which a party knew of and protected against such risks.
>
> Another factor in evaluating the reasonableness of preservation efforts is proportionality. The court should be sensitive to party resources; aggressive preservation efforts can be extremely costly, and parties (including governmental parties) may have limited staff and resources to devote to those efforts. A party may act reasonably by choosing a less costly form of information preservation, if it is substantially as effective as more costly forms. It is important that counsel become familiar with their clients' information systems and digital data--including social media--to address these issues. A party urging that preservation requests are disproportionate may need to provide specifics about these matters in order to enable meaningful discussion of the appropriate preservation regime.

Advisory Committee's note to 2015 amendment.

Here, the evidence presents a close call as to whether EMTA took reasonable steps to preserve the subject audio file. On one hand, the evidence suggests that, as of August 2022, EMTA administered its electronic information storage system in good faith by automatically recording certain electronic communications in its paratransit department and then indefinitely storing those recordings on a designated server, which allowed EMTA personnel to access the recordings as needed. The Court appreciates that EMTA likely manages a relatively high volume of ESI, given the nature of its business and its need to comply with federal regulatory standards. The Court is also mindful that perfection in preserving all relevant ESI is neither possible nor required under the rule. Further the Court notes that EMTA was not responsible for the malfunctioning of the server, and it received notice of the server's "strange behavior" only a day and a half before the server crashed.

Yet, the Court considers EMTA to be a sophisticated litigant which presumably has more familiarity with its preservation obligations than most individual litigants would have. Moreover, technical glitches such as the loss of a server are a generally foreseeable, if not

8

entirely predictable, problem. In light of the obvious importance of the audio recording as a key piece of evidence bearing on the circumstances of Plaintiff's termination, and given the specter of prospective employment litigation, EMTA was arguably unreasonable in failing to have taken extra protective measures to secure the audio file once it was placed on notice that the server was behaving strangely.

Moreover, it is clear to the Court that Plaintiff is prejudiced by the loss of the audio file. To be sure, the Defendant is also prejudiced. EMTA contends that the recording would have demonstrated Plaintiff's insubordination toward Hudson and thereby provided proof of its nondiscriminatory reason for terminating Plaintiff's employment. But to the extent the recording would have supported Plaintiff's version of the June 18, 2022 incident, it was the best available evidence for rebutting EMTA's proffered explanation for the firing. Without the benefit of the recording, Plaintiff has only his own testimony to rely on, whereas EMTA can presumably call Hudson, Torres, Myers, and Lugo as potential fact witnesses. That would give EMTA an unfair advantage at trial, especially when considering that Plaintiff had nothing whatsoever to do with the loss of the recording.

Given that Plaintiff is prejudiced by the destruction of the audio file, the Court must fashion a remedy that is "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). However, such a remedy is best determined in the context of a potential trial, should this litigation proceed to that stage. The Court will presently defer on ordering corrective measures because it perceives no material prejudice to Plaintiff at the Rule 56 stage. To the extent a genuinely disputed issue of fact exists concerning the circumstances of Plaintiff's interaction with Dispatcher Hudson, Plaintiff's own testimony presently suffices to establish his version of the relevant events.

To the extent Plaintiff seeks more significant and/or immediate sanctions, that request will be denied. In particular, the Court does not agree with Plaintiff's assessment that EMTA acted with intent to deprive him of the audio recording, warranting the more severe sanctions outlined in Rule 37(e)(2). "Because bad faith is rarely evident on its face and judges cannot directly observe a party's motivation for spoliating, judges may consider circumstantial evidence to determine intent." *Domus BWW Funding, LLC,* 2024 WL 3761737, at *4 (citing *Bistrian v. Levi*, 448 F.Supp.3d 454, 475 (E.D. Pa. 2020)). Among the non-exhaustive factors that courts may consider are (1) the timing of the destruction; (2) the method of destruction; (3) whether destruction was selective or indiscriminate; and (4) the spoliating party's policies for retention and destruction. In this case, the timing of the destruction occurred after Plaintiff filed his EEOC charge but before the commencement of formal litigation. In this Court's view, the timing is not particularly suggestive of bad intent. The "method" of destruction was an inadvertent malfunctioning of the server which housed the recording in question – again, not suggestive of bad faith on the part of EMTA. The loss of the server resulted in an indiscriminate loss of all audio data on that server, not just the recording pertinent to Plaintiff's claims. Moreover, it was against EMTA's interests to lose the audio recordings, as the recordings helped to ensure EMTA's compliance with federal regulatory standards. Finally, EMTA's unofficial policy was to retain audio recordings indefinitely; there was no affirmative action on EMTA's part that resulted in the destruction of the June 18, 2022 audio recording between Plaintiff and Hudson. All of these considerations point to a lack of any intent on EMTA's part to intentionally deprive Plaintiff of the use of the audio recording.

Plaintiff nevertheless characterizes EMTA's conduct as "reckless and irresponsible" in that it failed to (1) maintain a retention policy for its documents and audio recordings, (2) backup

its server, or (3) take any steps to preserve the recording after learning of the server's strange activity on August 23, 2022. In this Court's view, these alleged deficiencies do not establish that EMTA acted in bad faith relative to the lost audio recording. Although EMTA did not maintain a written retention policy, the evidence establishes that, as a practical matter, its unofficial policy and practice was to retain recordings indefinitely on its server rather than to delete recordings after a particular period of time.[2] There is no basis for inferring that, but for the absence of a retention policy, the recording would have been saved. As for EMTA's failure to back up the server or actively attempt to preserve the recording between August 23 and 25, the court finds that these omissions do not evidence an intent on the part of EMTA to deprive Plaintiff of the use of the audio recording. At most, they may be indicative of negligence; however, negligence is not sufficient to warrant the imposition of sanctions under Rule 37(e)(2). *See Two Canoes LLC v. Addian Inc.*, No. 21-CV-19729 (SDW) (JRA), 2024 WL 2939178, at *10 (D.N.J. Apr. 30, 2024) (citing authority), *report and recommendation adopted*, No. CV 21-19729 (SDW) (JRA), 2024 WL 3470851 (D.N.J. July 19, 2024).

In his brief, Plaintiff cites a number of decisions in which courts both inside and outside of this judicial circuit have imposed sanctions on a spoliating party, either under Rule 37 or pursuant to the court's own inherent authority. *See, e.g., Ace Am. Ins. Co. v. First Call Env't, LLC,* No. 5:21-cv-2331-JMG, 2023 U.S. Dist. LEXIS 3135, *11-12 (E.D. Pa. Jan. 9, 2023); *Decker v. Target Corp.*, 1:16-cv-00171, 2018 U.S. Dist. LEXIS 175373 (D. Utah Oct. 9, 2018); *Ala. Aircraft Indus. v. Boeing Co.*, 319 F.R.D. 730 (N.D. Ala. 2017); *Moody v. CSX Transp.,*

---

[2] The Court agrees with EMTA that Plaintiff's suggestion to the contrary is premised on a misreading of Torres' deposition testimony. When questioned how long recordings are retained, Torres responded "That depends. Sometimes we have server issues that make [sic] skip and nothing is recorded or lasts." Torres Depo., ECF No. 45-6 at 56:3-7. Fairly read, Torres' testimony suggests that occasional technical malfunctions could inadvertently disrupt the recording process, but this is in no way inconsistent with Lugo's testimony that EMTA's practice was to indefinitely retain its audio recordings between drivers and dispatchers.

*Inc.*, 271 F. Supp. 3d 410 (W.D.N.Y. 2017); *O'Berry v. Turner*, 7:15-CV-00064-HL, 2016 U.S. Dist. LEXIS 55714 (M.D. Ga. Apr. 27, 2016); *Europe v. Equinox Holdings , Inc.*, 20-CV-7787, 2022 U.S. Dist. LEXIS 50253 (S.D.N.Y. Mar. 21, 2022). For present purposes, it will suffice to say that the undersigned has reviewed and considered each of these cases but finds them insufficiently analogous to provide persuasive guidance on the issue of EMTA's intent to spoliate evidence.

### III.     CONCLUSION

Based on upon the foregoing reasons, the Court will deny Plaintiff's motion with prejudice insofar as he seeks sanctions pursuant to Rule 37(e)(2). To the extent Plaintiff seeks corrective measures under Rule 37(e)(1), his motion will be denied without prejudice and may be reasserted at a later point in these proceedings, should the case survive a summary judgment.

An appropriate order follows.

Susan Paradise Baxter
United States District Judge